# IN THE SUPREME COURT OF IOWA

No. 18–1329

Filed May 29, 2020

**TERRI ENDRESS,**

Appellee,

vs.

**IOWA DEPARTMENT OF HUMAN SERVICES,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

DHS seeks further review of a court of appeals decision. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Tabitha J. Gardner, Assistant Attorney General, for appellant.

Trent W. Nelson of Sellers, Galenbeck & Nelson, Des Moines, for appellee.

**CHRISTENSEN, Chief Justice.**

In this case, the Iowa Department of Human Services (DHS) waited two years to attempt recoupment of $16,003.94 for child-care services rendered by the provider during agency review of her cancelled provider agreement. We must decide whether the provider was given constitutionally sufficient notice of DHS's intent to recoup payments. DHS sent a notice cancelling the agreement. The notice advised the provider of a right to appeal but cautioned, "Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct." On appeal, DHS affirmed its decision to cancel the provider's agreement. Years later, DHS also found that the provider had to pay back the $16,003.94. On judicial review, the district court reversed DHS's decision on recoupment. It reasoned DHS's notice to the provider did not afford her procedural due process. The district court, however, denied attorney fees to the provider under Iowa Code section 625.29(1)(*b*) (2017). On appeal, the court of appeals affirmed the decision of the district court on the merits while reversing with respect to the award of attorney fees.

We granted further review. Upon our review, we conclude DHS's notice meets procedural due process requirements. However, we also conclude that DHS erred in refusing to consider the provider's unjust-enrichment defense to the recoupment proceeding. On remand to the agency, the provider should be allowed an opportunity to raise unjust enrichment as an offset to DHS's effort to recoup overpayments. With respect to attorney fees, DHS's role was primarily adjudicative, and it is not liable for attorney fees. Therefore, we vacate the decision of the court of appeals and affirm in part and reverse in part the judgment of the district court. We remand the case to the district court to remand to DHS for consideration of the provider's equitable relief.

Three justices of this court have joined this entire opinion. The concurrence in part and dissent in part filed by Justice McDonald on behalf of three justices joins divisions III.A and III.C of this opinion, while dissenting as to division III.B. The concurrence in part and dissent in part filed by Justice Appel contingently joins division III.B of this opinion, while dissenting as to divisions III.A and III.C. Accordingly, this opinion controls all aspects of the resolution of this appeal.

## I. Background Facts and Proceedings.

In 2012, Terri Endress received DHS registration as an approved Category B DHS child-care provider. Endress entered into a Child Care Assistance Provider (CCAP) agreement with DHS on March 6, 2013. This agreement allowed Endress to receive state funds to provide child care for eligible children, not to exceed twelve children at any one time. The agreement had a two-year term and provided that if it was terminated, termination "may prevent" Endress from reapplying to be a provider for six months.

DHS received at least three reports against Endress, indicating more children were present in her day care than allowed under her registration.[1] The DHS investigator never found more than twelve children present during his spot checks. Nor did DHS find any other health or safety violations associated with the day care. However, on reviewing the billings, DHS found Endress had submitted billings that would have indicated thirteen to fifteen children were present at the same time.

On July 17, 2014, Endress received notice from DHS cancelling her CCAP agreement because she had repeatedly submitted claims for payment to which she was not entitled (based on the number of children

---

[1]Two of the reports *predated* the March 6, 2013 agreement.

shown under her care at specific times). The notice of cancellation explained Endress may keep her benefits until an appeal is final. However, the notice cautioned, "Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct."

Endress elected to receive funding while she appealed the decision cancelling her CCAP agreement. As a result, Endress received a July 31, 2014 notice:

> You have timely appealed the cancellation or denial of your CCA provider agreement. You are therefore allowed to continue to receive child care assistance funding pending the outcome of your appeal. *Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct.*

(Emphasis added.) DHS issued a final decision on November 17, 2014, sustaining the proposed decision to cancel Endress's CCAP agreement because she repeatedly made billings for children in excess of the numbers allowed for her care at any one time.

On March 17, 2017, Endress was approved by DHS for another CCAP agreement. On April 3, Endress received a "Notice of Child Care Assistance Overpayment" in the amount of $16,003.94[2] for the months of July 2014 to November 2014. DHS alleged the overpayment was due to "[a] mistake by [Endress] that caused DHS to pay [her] incorrectly for child care services" and that the "overpayment happened because of [her] choice to continue benefits pending an appeal." Endress appealed, and an administrative law judge (ALJ) affirmed DHS's computation of overpayment for child-care assistance.

This proposed decision was adopted as DHS's final decision, and Endress petitioned for judicial review. She argued DHS violated her due

---

[2]The original notice stated the amount owed as $16,001.94. That was later corrected to the present amount, $16,003.94.

process rights through insufficient notice of its intent to recoup payments during her pending appeal. She also argued that she had not been overpaid; she had provided appropriate child care at DHS rates for the children entrusted to her. Endress pointed out that if there was any overpayment, based on the DHS audit, it amounted only to $623.28 at most and not the full amount (over $16,000) she was paid over four months for child-care services rendered. The district court granted Endress's petition and reversed the decision of DHS. On judicial review, it determined DHS exceeded its statutory authority in promulgating the recoupment provisions of its administrative rules, the administrative rules were unconstitutionally vague, and DHS's implementation of the administrative rules violated Endress's procedural due process rights. Endress also sought attorney fees, which the district court denied.

DHS appealed, and Endress cross-appealed the denial of attorney fees. On appeal, the court of appeals agreed that Endress maintained a protected property interest in payments made under the CCAP agreement and that the notice of recoupment was constitutionally deficient. However, it reversed the district court's determination that Endress was not entitled to attorney fees.

DHS applied for further review, and we granted its application.

**II. Standard of Review.**

Different standards of review apply to the claims raised by Endress. First, the Iowa Administrative Procedure Act defines the standards we apply in our judicial review of agency action to determine whether we reach the same conclusion as the district court. *See* Iowa Code § 17A.19(10); *Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 242 (Iowa 2018). "The district court may properly grant relief if the agency action prejudiced the substantial rights of the petitioner and if the agency action falls within one

of the criteria listed in section 17A.19(10)(*a*) through (*n*).” *Brakke v. Iowa Dep’t of Nat. Res.*, 897 N.W.2d 522, 530 (Iowa 2017).

Second, Endress’s constitutional claims in agency proceedings are reviewed de novo. *Ghost Player, L.L.C. v. State*, 860 N.W.2d 323, 326 (Iowa 2015).

Finally, with respect to whether attorney fees are available, we apply the standard of correction of errors at law. *Colwell v. Iowa Dep’t of Human Servs.*, 923 N.W.2d 225, 232 (Iowa 2019).

### III. Analysis.

**A. Procedural Due Process.** Endress alleges a violation of her procedural due process rights under the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. We will apply the federal substantive standards because Endress does not suggest we follow different substantive standards under the Iowa Constitution. *See Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 566 (Iowa 2019) (applying federal substantive standards to a party’s procedural due process claim raised under the Iowa Constitution); *State v. Russell*, 897 N.W.2d 717, 732 & n.7 (Iowa 2017) (“Russell also did not present an argument for why we should depart from established precedent in our interpretation of the Iowa Constitution’s due process clause. We therefore treat both [federal and state] claims as the same.”).

Endress is entitled to procedural due process if a state action threatens to deprive her of a protected interest in life, liberty, or property. *Behm*, 922 N.W.2d at 566; *Russell*, 897 N.W.2d at 732–33; *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 690 (Iowa 2002). Accordingly, as a first step, Endress must show a protected interest is involved. *See Behm*, 922 N.W.2d at 566; *State v. Willard*, 756 N.W.2d 207, 214 (Iowa 2008).

We have explained, "Protected property interests ' "are created and their dimensions are defined" not by the Constitution but by an independent source such as state law.' " *Willard*, 756 N.W.2d at 214 (quoting *State v. Seering*, 701 N.W.2d 655, 665 (Iowa 2005), *superseded by statute on other grounds*, 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)), *as recognized in AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 31 (Iowa 2019)). This includes "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972); *Orloff v. Cleland*, 708 F.2d 372, 377 (9th Cir. 1983) ("Entitlements are created by 'rules or understandings' from independent sources, such as statutes, regulations, and ordinances, or express or implied contracts." (quoting *Roth*, 408 U.S. at 577, 92 S. Ct. at 2709)).

The district court concluded the relevant statute at issue—in conjunction with its administrative rules—created DHS's statutory obligation to pay for the child-care services Endress provided during her appeal. The statute relied on provides,

> The department's billing and payment provisions for the program shall allow providers to elect either biweekly or monthly billing and payment for child care provided under the program. *The department shall remit payment to a provider within ten business days of receiving a bill or claim for services provided.* However, if the department determines that a bill has an error or omission, the department shall notify the provider of the error or omission and identify any correction needed before issuance of payment to the provider. The department shall provide the notice within five business days of receiving the billing from the provider and shall remit payment to the provider within ten business days of receiving the corrected billing.

Iowa Code § 237A.13(4) (2017) (emphasis added). It reasoned the legislature's use of "shall" mandated a duty, *see* Iowa Code § 4.1(30)(*a*),

which was fulfilled by DHS's accompanying rule, *see* Iowa Admin. Code r. 441—7.9(1) (2017).

We assume, without deciding, that Endress did have a protected property interest in payments under her CCAP agreement. Therefore, our next step is to determine whether Endress was afforded procedural due process. Procedural due process requires, at the very least, "notice and opportunity to be heard in a proceeding that is 'adequate to safeguard the right for which the constitutional protection is invoked.' " *Willard*, 756 N.W.2d at 214 (quoting *Seering*, 701 N.W.2d at 665–66). Endress does not challenge the district court's finding that she was given an opportunity to be heard. The contention lies with the notice DHS provided. Endress asserts DHS's notice is not a sufficient warning of the action taken against her. We have said, "Notice must be reasonably calculated to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Meyer v. Jones*, 696 N.W.2d 611, 614 (Iowa 2005) (quoting *In re Estate of Borrego*, 490 N.W.2d 833, 837 (Iowa 1992)). We conclude the notice DHS provided Endress meets this requirement.

The first notice Endress received was DHS's "Notice of Decision: Child Care." This notice explained DHS was cancelling Endress's CCAP agreement and specifically stated, "This action means you are no longer eligible to receive CCA payments, it does not change your status as a child development home or licensed center." The notice also provided Endress with a right-to-appeal document. As stated in the appeal document, Endress could elect to keep her benefits until an appeal is final. However, it cautioned, "Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct." Endress claims the use of "benefits" connotes a broader gratuity or assistance not

applicable to her; she also argues that the cautionary language about repayment of "benefits" does not mean that she may be required to pay back her earned funds.

Iowa Code chapter 237A does not define "benefits." Likewise, the relevant administrative rules as well as the provider agreement are silent on this definition. "In the absence of a legislative definition of a term or a particular meaning in the law, we give words their ordinary meaning." *State v. Kidd*, 562 N.W.2d 764, 765 (Iowa 1997). The dictionary is a source for the common and ordinary meaning of a word. *Id.* "Benefits" is defined as "to be useful or profitable to : AID, ADVANCE, IMPROVE." *Benefits*, *Webster's Third New International Dictionary* (unabr. ed. 2002). We determine the plain and ordinary definition of "benefits" includes funds provided to Endress by DHS for child-care services.

Our understanding of what "benefits" means is further supported by the context of the second notice Endress received. Endress appealed DHS's decision to cancel her CCAP agreement. As part of the appeals process, Endress selected "Yes" to whether she wanted her "Benefits [to] Continue." Her decision prompted DHS to send a second notice indicating she appealed the cancellation of her agreement. Important to our decision here, the second notice advised Endress that she was "allowed to continue to receive child care assistance *funding* pending the outcome of [her] appeal." (Emphasis added.) The second notice again cautioned, "Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct." It is clear the plain and ordinary meaning of "benefits" includes any funds Endress received while her appeal was pending. The notice from DHS need only "be reasonably calculated to apprise interested parties of the pendency of the action." *Meyer*, 696 N.W.2d at 614 (quoting *In re Estate of Borrego*, 490 N.W.2d at

837).  DHS's notice meets this requirement and Endress was thus afforded procedural due process.

**B. Equitable Relief.**  We do not agree that this ends the matter, though.  While Endress's appeal was pending, DHS was getting the benefit of child-care services from her.  As a DHS-approved Category B child-care provider, Endress provided eligible families with child-care services.  *See* Iowa Code § 237A.13(1)(*a*)–(*f*); Iowa Admin. Code r. 441—170.4(3)(*b*).  More importantly, DHS-approved providers could also provide child-care services for a child with protective needs in order to prevent or alleviate abuse or neglect, *see* Iowa Code § 237A.13(1)(*e*), and child-care services provided under a court order, *see* Iowa Admin. Code r. 441—170.3(2)(*d*).  Because of the exigent circumstances surrounding child abuse or neglect, the benefits of protective child care and court-ordered child care are provided irrespective of whether that child's family is eligible for state child-care assistance.  *See* Iowa Admin. Code r. 441—170.3(2)(*c*), (*d*).  When the state exercises its removal power to prevent or alleviate harm to a child, *see* Iowa Code §§ 232.78, .79, .79A, .102(1)(*a*)(3), the DHS-approved child-care providers benefit the state by keeping the removed child safe.

It is the state's obligation, as *parens patriae*, to ensure every child receives proper care and treatment.  *Hensler v. City of Davenport*, 790 N.W.2d 569, 583 (Iowa 2010) ("The state has a legitimate interest to promote the public welfare or the well-being of the child."); *In re K.N.*, 625 N.W.2d 731, 735 (Iowa 2001) (en banc) ("We have also observed that it is the State's duty, as parens patriae, to ensure that the aims of the juvenile justice code are applied to each child in need of the code's assistance."); *In re Guardianship of Hedin*, 528 N.W.2d 567, 571 (Iowa 1995) (en banc) (stating it is the state's obligation under the doctrine of *parens patriae* to

care for vulnerable and less fortunate persons); *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) ("The State, as parens patriae, has the duty to make sure that every child within its borders receives appropriate care and treatment. Our juvenile statutes are designed to effectuate that duty." (Citation omitted.)). The state may use a wide range of powers to ensure a child's safety, *see Hensler*, 790 N.W.2d at 583, which include financial demands on the public fisc, *see* Iowa Code § 237A.12 ("Subject to the provisions of chapter 17A, the department shall adopt rules setting minimum standards to provide quality child care in the operation and maintenance of child care centers and registered child development homes . . . ."); *id.* § 237A.29(1) (allowing state and federal funds to pay for child-care services); *Galloway v. State*, 790 N.W.2d 252, 257, 258 (Iowa 2010) ("If parents fail to provide for the needs of their injured children, and the preinjury waiver in favor of the tortfeasor is enforced, financial demands may be made on the public fisc to cover the cost of care."); Clare Huntington, *Welfare Reform and Child Care: A Proposal for State Legislation*, 6 Cornell J.L. & Pub. Pol'y 95, 115 (1996) ("Importantly, because child care subsidies funds were drawn directly from the public fisc, the CCBDG [Child Care and Development Block Grant] succeeded in shifting the cost of child care away from the working poor and onto society at-large.").

Endress contends it would be unreasonable, arbitrary, capricious, or an abuse of discretion for DHS to receive free child-care services from her during the four months in 2014 that her appeal was pending. The rules allow for recovery of "overpayments . . . due to benefits or payments issued pending an appeal decision . . . . Overpayments shall be computed as if the information had been acted upon timely." Iowa Admin. Code r. 441—170.9(2). Endress argues that if this rule is interpreted as allowing

DHS to take back everything it paid her from July to November 2014 regardless of the benefit received, DHS would be unjustly enriched.

Endress asserted this unjust enrichment argument before the agency. The ALJ rejected this argument on the ground that the doctrine is a basis for *recovering* funds in a civil action, not a *defense* in an administrative action. The DHS director adopted the ALJ's decision and did not separately address this issue at all.

We think this was error. Under the law of contracts, even when a party is in breach, the party "has a claim in restitution against the recipient of performance, as necessary to prevent unjust enrichment." Restatement (Third) of Restitution & Unjust Enrichment § 36(1), at 585–86 (Am. Law Inst. 2011). It is true that such claims may be limited or denied because of the breaching party's inequitable conduct, *see id.* § 63, at 487, but DHS never engaged in this analysis. Unjust enrichment could have been considered as a defense or offset.

Also, the notice itself did not specify that any payments received during the appeal period "shall" be returned to DHS if Endress lost her appeal. It said that the benefits "may" have to be paid back. Inherent in the word "may" is that the agency has discretion. *See State ex rel. Lankford v. Allbee*, 544 N.W.2d 639, 641 (Iowa 1996). And that discretion is subject to reversal if it is unreasonable, arbitrary, capricious, or an abuse of discretion. *See* Iowa Code § 17A.19(10)(*n*). DHS's rule states that "overpayments" shall be recouped from child-care providers. *See* Iowa Admin. Code r. 441—170.9(2). The word "overpayment" is pervasive. But this begs the question of whether a child-care provider has been "overpaid" during an appeal period when DHS receives child-care services and has no complaint about their quality or the provider's registration. Endress's very point—which DHS declined to consider—was she had only been

"overpaid" at most $623.28. Further, Endress testified that she had paid her own employees out of the $16,000. Additionally, she testified that between November 2014 and March 2017 she simply switched roles with one of her employees who held the DHS contract; presumably, that same arrangement could have been made during the appeal period.

Unjust enrichment is rooted in the principle that one party should not be unjustly enriched at the expense of another party. *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154 (Iowa 2001). We have previously recognized that "unjust enrichment is a broad principle with few limitations." *Id.* at 155. The remedies under this doctrine may be legal, equitable, or both. Restatement (Third) of Restitution & Unjust Enrichment § 4, at 27; *id.* § 4 cmt. *b*, at 28 ("The law of restitution is not easily characterized as legal or equitable, because it acquired its modern contours as the result of an explicit amalgamation of rights and remedies drawn from both systems."). Unjust enrichment has three basic elements: "(1) enrichment of the defendant, (2) at the expense of the plaintiff, (3) under circumstances that make it unjust for the defendant to retain the benefit." *Behm*, 922 N.W.2d at 577. In the past, we have considered a plaintiff's unjust-enrichment claim against DHS and the State of Iowa. *See Ahrendsen ex rel. Ahrendsen v. Iowa Dep't of Human Servs.*, 613 N.W.2d 674, 679 (Iowa 2000) (en banc) (holding "neither DHS nor the State of Iowa was unjustly enriched by denying an application for Medicaid benefits on a ground that was consistent with federal statutory law and the DHS regulations"); *see also Krieger v. Iowa Dep't of Human Servs.*, 439 N.W.2d 200, 203 (Iowa 1989) ("The DHS was not 'enriched' by the services

rendered for the Waterloo Pollution Control Plant."); *Dolezal v. City of Cedar Rapids,* 326 N.W.2d 355, 358 (Iowa 1982).[3]

We do not think the law draws a distinction based on the procedural status of the matter. Thus, the mere fact that DHS had *paid* for the July 2014 to November 2014 services and thus was initiating the claim, rather than defending Endress's claim, should not make a difference. Either way,

---

[3]The cases of *Kreiger,* 439 N.W.2d 200, *Marshall v. State,* 559 N.W.2d 612 (Iowa 1997), and *Ahrendsen,* 613 N.W.2d 674, are all distinguishable on their facts.

In *Krieger,* an individual who received welfare benefits while failing to disclose an asset that rendered him ineligible became the subject of a DHS recoupment action. 439 N.W.2d at 201. He did not dispute that recoupment was appropriate but argued that he should receive credit for services he had provided without compensation under a community work experience program as a condition of receiving his benefits. *Id.* We held unjust enrichment was not an appropriate offset under the facts of that case, reasoning, "[W]e . . . reject Krieger's unjust enrichment argument. The DHS was not 'enriched' by the services rendered for the Waterloo Pollution Control Plant. Krieger worked for the Waterloo plant, not for the DHS, and the DHS received no benefits from his services." *Id.* at 203. Of course, welfare benefits are different from contracted child-care services. *See id.* at 201. The work requirement was intended to make Krieger more employable and to provide a benefit to the Waterloo plant—not to provide a benefit to DHS. *See id* at 202–03.

In *Marshall,* an individual who received welfare benefits when she was not eligible due to having provided false information was required to pay all those benefits back. 559 N.W.2d at 615. We upheld the agency's determination that lack of fraudulent intent was not a defense to repayment. *Id.* But, again, welfare benefits are different from contracted child-care services. The applicable state administrative rule was different. *See id.* at 614. And federal law left no discretion as to whether those benefits had to be recovered. *Id.*

In *Ahrendsen,* an estate sought more than three months of retroactive Medicaid benefits, even though federal law and state regulations limited retroactivity to only three months. 613 N.W.2d at 677. The estate pointed out that the Medicaid application had been delayed because DHS had provided incorrect information. *Id.* at 676. We upheld DHS's denial of more than three months of benefits and also denied recovery under unjust enrichment. *Id.* at 678–79. We explained, "We are convinced that neither DHS nor the State of Iowa was unjustly enriched by denying an application for Medicaid benefits on a ground that was consistent with federal statutory law and the DHS regulations." *Id.* at 679. But there the federal law and regulations gave no room for discretion. *Id.* at 677. Furthermore, as in *Marshall,* these were benefits rather than payments for services rendered. *See id.* at 675. So it would be unrealistic to say DHS had been "unjustly enriched" when it received nothing in return. *See id.* at 679.

A key point is that none of these cases said that unjust enrichment could not apply to DHS recoupment proceedings. In fact, *Krieger* and *Ahrendsen* implicitly recognized it could apply under the appropriate facts.

it seems inequitable for DHS to get needed child-care services for nothing. This is not to say that Endress is entitled to keep all of the $16,003.94. She has the burden of showing the benefit she conferred on DHS during the four months in question that should be offset against DHS's requested recoupment. For example, she must demonstrate that during the four months, the day care was operating lawfully and did not have an excessive number of children. To the extent DHS has suffered loss attributable to Endress's violations of the CCAP agreement, that should be taken into account as well. *See* Restatement (Third) of Restitution & Unjust Enrichment § 36, at 585–86; *id.* § 63, at 487. In short, the issue remaining is whether DHS's enrichment at Endress's expense was "under circumstances that make it unjust for [DHS] to retain the benefit." *Behm*, 922 N.W.2d at 577. Therefore, we remand to the district court to remand to the agency so that it may fully consider Endress's unjust-enrichment claim as an offset against DHS's claim for recoupment.

**C. Attorney Fees.** Iowa law authorizes a court to award attorney fees to a party that prevails in a judicial review action brought against the state pursuant to chapter 17A. Iowa Code § 625.29(1). However, there is an exception.

> [T]he court shall not make an award under this section if it finds one of the following:
>
> . . . .
>
> *b.* The state's role in the case was primarily adjudicative.

*Id.* § 625.29(1)(*b*). The district court considered the exceptions under section 625.29(1) and concluded DHS's role in the case was primarily adjudicative. Accordingly, it declined to award Endress attorney fees.

Endress now claims the agency did not adjudicate the rights and duties of the parties but rather preserved the issues for judicial review.

Within the context of section 625.29(1), our court addressed the meaning of "primarily adjudicative." We have explained, "[I]t can be said that if an agency's function principally or fundamentally concerns settling and deciding issues raised, its role is primarily adjudicative." *Remer v. Bd. of Med. Exam'rs*, 576 N.W.2d 598, 601 (Iowa 1998) (en banc). The role of the agency is viewed " 'in the case' at bar," not the agency's role generally. *Id.* Therefore, we must determine whether the agency's role in Endress's case principally or fundamentally concerned settling and deciding issues raised.

We addressed whether the role of an agency was primarily adjudicative in *Branstad v. State ex rel. Natural Resource Commission*, 871 N.W.2d 291 (Iowa 2015). *Branstad* concerned the Iowa Department of Natural Resources (DNR) investigation and subsequent restitution assessment following a fish kill. *Id.* at 292–93. A contested hearing was held before an impartial ALJ to address the assessment of restitution, including the amount. *Id.* at 293, 297. After the ALJ issued a proposed decision affirming the DNR's assessment, Branstad appealed to the Iowa Natural Resource Commission. *Id.* at 298. The commission affirmed the proposed decision, which became the final decision. *Id.* Branstad petitioned for judicial review, and this court was asked to determine whether the state's role was primarily adjudicative. *Id.* at 294–95.

The *Branstad* court cited our previous understanding of "primarily adjudicative" as expressed in *Remer*. *See id.* at 295–96. It also noted the role of the commission was to "[hear] appeals in contested cases pursuant to chapter 17A." *Id.* at 296 (quoting Iowa Code § 455A.5(6)(*b*)). Ultimately, the commission "weighed the evidence about the fish kill, applied the

rules, considered Branstad's various defenses, and determined that the amount in the restitution assessment was proper." *Id.* Its actions fell squarely within the meaning of adjudicate. *Id.* at 297.

The procedure in *Branstad* aligns with Endress's case. Following reports that Endress had more than twelve children present at certain times, DHS conducted an investigation. It found Endress submitted claims for payment to which she was not entitled. This led DHS to terminate Endress's CCAP agreement and later to recoup overpayments. Endress appealed DHS's decision to recoup overpayments in a contested case before an impartial ALJ. The notice of hearing before the ALJ framed the issue as "[w]hether the Department correctly computed and established a claim for overpaid child care assistance." In support of her nonadjudicative position, Endress points out DHS's own rules indicate the recovery of overpayments "is not an appealable issue." Iowa Admin. Code r. 441—7.9(7). However, the proposed decision rejected this position and specifically addressed whether DHS correctly computed and established overpayment. The authority to address whether DHS correctly computed overpayment is in fact provided by DHS's rules: "[A]ppeals may be heard on the computation of excess assistance paid pending a final decision." *Id.* Although the impartial ALJ made the initial proposed decision, DHS made the final decision after it weighed evidence about recoupments, applied rules, and determined the rights of the parties. *See Branstad*, 871 N.W.2d at 297.

We are not persuaded the state's role was to primarily preserve arguments. DHS's final decision adopted the proposed decision, which affirmed "[DHS's] decision establishing and computing a claim for overpayment against [Endress] in the amount of $16,003.94." It is true DHS's final decision preserved Endress's constitutional arguments for

judicial review. This is because DHS lacked authority to decide her constitutional issues. *See Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 688 (Iowa 1994). Moreover, Endress is required to raise constitutional issues at the agency level, even though the agency lacks the authority to decide the issues, in order to preserve the constitutional issues for judicial review. *See McCraken v. Iowa Dep't of Human Servs.*, 595 N.W.2d 779, 785 (Iowa 1999). Contrary to Endress's position, preserving an issue for judicial review because the agency lacks authority to decide the issue does not automatically brand the agency action as nonadjudicative. If DHS determines it lacks jurisdiction to hear a dispute it could otherwise adjudicate, a prevailing party cannot ask for section 625.29(1) attorney fees against DHS as the adjudicator. *See Colwell*, 923 N.W.2d at 238. DHS has the authority to determine for itself if it has subject matter jurisdiction over a matter. *Id.* As we explained in *Colwell,*

> Every court has inherent power to determine whether it has jurisdiction over the subject matter of the proceedings before it. It makes no difference how the question comes to its attention. Once raised, the question must be disposed of, no matter in what manner of form or stage presented. The court on its own motion will examine grounds of its jurisdiction before proceeding further.

*Id.* (quoting *Carmichael v. Iowa State Highway Comm'n,* 156 N.W.2d 332, 340 (Iowa 1968)).

In this case, DHS preserved the constitutional issues it lacked authority over, addressed whether it correctly computed and established overpayments, and settled the issues raised. Endress is concerned the use of the agency appeal system to preserve issues for judicial review gives the false impression that adjudication occurred, thereby preventing potential attorney fees under section 625.29(1)'s exceptions. We previously addressed this concern in *Branstad*:

> [A] commentator who has reviewed the legislative history notes that, while there is no explanation provided in the legislation, previous proposed bills would have eased the ability to award attorney fees against the State. These bills were rejected in favor of more limiting language contained in the final legislation. Key among legislative concerns with prior forms of the bill was the cost to the State if attorney fees were awarded often.

*Branstad*, 871 N.W.2d at 297 (citations omitted). If the legislature intended to ease the ability to award attorney fees, it would have done so.

The principal function of DHS in the case at bar was primarily adjudicative. Therefore, DHS is not liable for Endress's attorney fees under Iowa Code section 625.29(1)(*b*).

### IV. Conclusion.

For the aforementioned reasons, the decision of the court of appeals is vacated. We affirm the judgment of the district court in part, reverse in part, and remand to the district court with directions to remand the matter to the agency to consider unjust enrichment as an offset (at least in part) to DHS's claim for recoupment.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

Waterman and Mansfield, JJ., join this opinion. Appel, J., files a concurrence in part and dissent in part. McDonald, J., files a separate concurrence in part and dissent in part joined by Oxley and McDermott, JJ.

#18–1329, *Endress v. Iowa Dep't of Human Servs.*

**APPEL, Justice (concurring in part and dissenting in part).**

In my view, this case presents a classic due process problem arising from an extreme case of administrative overreach that cries out for a judicial remedy. Further, because the Iowa Department of Human Services (DHS) did not adjudicate the most important issues in the administrative process, I conclude that Terri Endress is entitled to attorney fees under Iowa Code section 625.29 (2017).

## I. Factual and Procedural Background.

**A. Introduction.** Endress had a Child Care Assistance Provider (CCAP) agreement with the DHS to provide child care for low income persons. Under the agreement, she was to provide services to no more than twelve children. The agreement contained a repayment provision, which stated, "I understand that I may have to repay money received in error or as a result of fraudulent billing."

## B. First and Second DHS Notices of Decision.

1. *First notice.* DHS sent Endress a "Notice of Decision: Child Care" dated July 17, 2014. The notice declared that the CCAP agreement between Endress and DHS was cancelled because "Endress submitted claims for payment for which [she was] not entitled."

The notice provided that if Endress did not agree with the decision, she could discuss the decision with agency staff. Such informal discussions, however, did not diminish her right to a hearing. The notice further stated, "If your application has been denied or your assistance has been canceled, you have the right to reapply."

The notice provided that Endress had a right to appeal the decision. The notice stated if she appealed within ten days of the decision,

You may keep your benefits until your appeal is final or through the end of your certification period if you file an appeal . . . .

. . . .

Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct.

Endress filed an appeal within ten days of the notice.

2. *Second notice.* DHS sent Endress a second "Notice of Decision: Child Care." The notice stated that Endress timely appealed the cancellation or denial of her CCAP agreement. The second notice further stated,

You are therefore allowed to continue to receive child care assistance funding pending the outcome of your appeal. Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct.

The second notice repeated the statement of the original notice that Endress "may keep [her] benefits until an appeal is final or through the end of [her] certification period" if a timely appeal is filed. The second notice further stated, again, "Any benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct."

3. *Administrative decision on notices.* An administrative law judge (ALJ) held a telephonic hearing on the matter. Endress appeared on her own behalf; a representative from DHS appeared and called three witnesses. DHS submitted documents into the record including the CCAP agreement, complaint reports, attendance records, and the findings of a program manager. The ALJ characterized the issue as "[w]hether the Department correctly cancelled [Endress's] child care provider agreement for repeatedly submitting claims for payment to which Endress was not entitled." The ALJ noted that Endress certified that she would comply with

the minimum requirements for a child-care development home and that three reports were filed against her indicating that more children were present in her day care than were allowed under her registration. The ALJ noted, however, that the DHS investigator never directly observed that Endress had more children present in day care than allowed under her provider agreement.

The ALJ determined that on several occasions, Endress submitted bills indicating the presence of more than twelve children, and as a result, the ALJ determined that Endress had submitted claims for payment for which she was not entitled. While Endress suggested there were billing mistakes by employees, the ALJ determined that Endress repeatedly billed for children in excess of the number allowed for her care at any one time. As a result, the ALJ ruled that DHS's cancellation of her CCAP agreement should be sustained.

### C. Notice of Child-Care Assistance Overpayment.

1. *Introduction.* For several years, there was no further action taken by either Endress or DHS. In 2017, however, Endress applied for a new CCAP agreement and was accepted as a provider on about March 17.

2. *Notice of child-care assistance overpayment.* DHS sent Endress a "Notice of Child Care Assistance Overpayment" on April 3, 2017. The notice asserted that Endress owed DHS $16,001.94 for amounts paid between July 29, 2014, and November 23, 2014. The reason for the overpayment was said to be the result of "[a] mistake by a provider that caused DHS to pay the provider incorrectly for child care services." The dates the amounts owed were paid demonstrate that DHS was not seeking to recover for alleged overbillings but instead to recoup funds paid for services provided by Endress during the period when her appeal was pending before DHS. While DHS characterized the payments made for

services provided by Endress during the course of the appeals as a "mistake made by a provider," the funds DHS sought to recover were for services actually performed. The notice further states, "This overpayment happened because of your choice to continue benefits pending an appeal."

3. *Administrative decision on notice of child-care assistance overpayment.* Endress appealed the decision referenced in the notice of child-care assistance overpayment. On August 8, 2017, a hearing was held before an ALJ. DHS relied on Iowa Administrative Code rule 441—7.9(3) (2017), which states, "[E]xcess assistance paid pending a hearing decision shall be recovered to the date of the decision. This recovery is not an appealable issue. However, appeals may be heard on the computation of excess assistance paid pending a hearing decision." DHS took the position that the only issue that could be heard was the amount of money paid to Endress during the 2014 appeal.

The ALJ entered a proposed decision that agreed with DHS. With respect to Endress's due process claims, the ALJ declared that such constitutional arguments cannot be addressed on an administrative level but were preserved for judicial review. The ALJ also declined to address constitutional and statutory challenges to Iowa Administrative Code rule 441—170.9. In addition, the ALJ declined to consider contract law claims on the basis the claims rehashed the constitutional arguments she had already rejected. Finally, the ALJ declined to find unjust enrichment, noting that she was aware of no authority holding unjust enrichment could be used as a defense in an administrative action.

Endress appealed the proposed decision to the director, who affirmed the decision. Endress then filed a petition for judicial review in district court.

4. *District court decision on review of agency action.* Endress filed a petition for judicial review. The district court reversed. The district court found that Endress had a statutory property right in payments under Iowa Code section 237A.13(4), which provided that "[t]he departments shall remit payment to a provider within ten business days of receiving a bill or claim for services provided." Further, the district court cited Iowa Administrative Code rule 441—7.9, which provides, in part, "Assistance . . . shall not be suspended, reduced, restricted, or canceled, nor shall a license, registration, certification, approval, or accreditation be revoked or other proposed adverse action be taken pending a final decision on an appeal."

The district court also found a contractual interest in the payments. The district court based its decision on the CCAP agreement which noted, among other things, that the provider shall "have the status of an independent contractor." The contract, however, provided that DHS could cancel the agreement with ten days' notice for any violation of the agreement. The district court reasoned, however, that the notice of decision received by Endress terminated her rights under the contract (but not under the statute).

Having found a statutory property interest and partial contractual interest in the payments, the district court proceeded to consider whether Endress received adequate notice that all the funds paid, including those earned for new services, could be recouped by the state. The district court focused primarily on the fact that the notice indicated "any benefits" you get during the appeal may have to be paid back, but the CCAP agreement talks not in terms of benefits but refers to "fees" and "payments" and "money received." According to the district court, the parent of a child

receives the benefits, not a provider. The poor terminology in the notice, according to the district court, was "fatal."

The district court proceeded to consider whether the rules provided sufficient warning that payments for services earned during the pendency of an appeal could be recouped. The district court determined that the DHS rules were conflicting and did not provide reasonable notice to Endress. The district court noted that Iowa Administrative Code rule 441—7.9(1) provides that "[a]ssistance . . . shall not be suspended, reduced, restricted, or canceled, nor shall a license, registration, certification, approval, or accreditation be revoked or other proposed adverse action be taken pending a final decision on an appeal." But rule 441—170.9(2) states that "[a]ll overpayments due to client, provider, or agency error or due to benefits or payments issued pending an appeal decision shall be recouped." *Id.* r. 441—170.9(2). And, rule 441—7.9(7) provides that "[c]ontinued assistance is subject to recovery by the department if the department's action is affirmed. . . . When the department's action is sustained, excess assistance paid pending a final decision shall be recovered to the date of the decision." *Id.* r. 441—7.9(7).

The district court next turned to Iowa Administrative Code rule 441—170.9. The district court found the rule conflicted with itself. Rule 441—170.1 defines "overpayment" as "any benefit or payment received in an amount greater than the amount the client or provider is entitled to receive." *Id.* r. 441—170.1. But under rule 441—7.9(1), DHS is required to pay petitioner during the period of appeal and prohibits DHS from revoking her approval as a provider under the CCA program. *Id.* r. 441—7.9(1). Because Endress is entitled to receive payments during the pending of her appeal, the district court reasons that it is not an overpayment as an amount greater than the provider is entitled to receive.

The district court further noted that Iowa Administrative Code rule 441—7.5(9) defines program overpayment to mean "child care assistance was received by or on behalf of a person in excess of that allowed by law, rules, or regulations for any given month." But because Iowa Administrative Code rule 441—7.9(1) requires payment during the pendency of appeal, the district court reasoned that the provisions of Iowa Administrative Code rule 441—7.5(9) were not applicable.

Because the rules are conflicting and cannot be harmonized in a reasonable manner, the district court determined that the rules collectively have such total ambiguity that they "clearly, palpably, and without doubt infringe . . . the constitution."

The district court next turned to consider the statutory authority of DHS's recoupment rules. The district court held that neither Iowa Code chapter 237A nor chapter 17A contained any language that would reasonably support recoupment as advocated by DHS. The district court noted that Iowa Code section 237A.13(4) provided that "if the department determines that a bill has an error or omission, the department shall notify the provider of the error or omission and identify any correction needed before issuance of payment to the provider." But, according to the district court, there is nothing in Iowa Code chapter 237A.13 that authorizes DHS to recoup earned payments for services during the pendency of an appeal of an administrative decision canceling a provider contract. Further, the district court found nothing in Iowa Code chapter 17A to authorize the recoupment of funds paid during the pendency of an appeal.

The district court finally turned to unjust enrichment. The district court held that because the due process holdings of the court provided Endress with the relief she sought, there was no reason to exercise equity jurisdiction on an unjust enrichment theory.

The last issue considered by the district court was whether Endress was entitled to recover her attorney fees under Iowa Code section 625.29. The district court held that Endress was not entitled to fees. The district court reasoned that the action of DHS was primarily adjudicative because it determined the rights and duties of a party. Under the statute, attorney fees are not available when an agency acts in a primarily adjudicative capacity.

Endress filed a motion to reconsider under Iowa Rule of Civil Procedure 1.904(2). Endress pointed out that in the administrative proceeding, the only question considered was the value of the alleged overpayment and that Endress did not contest its value. But Endress argued that the administrative law judge did not consider her challenge to the rules and notices on statutory and constitutional grounds and that, as a result, the action was not "primarily adjudicative."

5. *Court of appeals.* DHS appealed, and we transferred the case to the court of appeals. The court of appeals found that Iowa Code section 237A.13(4) and Iowa Administrative Code rule 441—7.9 established a statutory property right in payments for child-care services. The court of appeals also agreed with the district court's reasoning that the notices were constitutionally deficient to support DHS's recoupment claim. The court of appeals, however, found that DHS's action was not "primarily adjudicative" and that, as a result, Endress was entitled to attorney fees under Iowa Code section 625.29.

**II. Discussion.**

**A. The Notices to Endress Were Insufficient and Any Resulting Deprivation of Property Violated Due Process of Law.**

1. *Protected property interest.* Iowa Code section 237A.13(4) provides a statutory property interest in payments for services under the program. This section provides,

> The department's billing and payment provisions for the program shall allow providers to elect either biweekly or monthly billing and payment for child care provided under the program. The department shall remit payment to a provider within ten business days of receiving a bill or claim for services provided. However, if the department determines that a bill has an error or omission, the department shall notify the provider of the error or omission and identify any correction needed before issuance of payment to the provider. The department shall provide the notice within five business days of receiving the billing from the provider and shall remit payment to the provider within ten business days of receiving the corrected billings.

This Code section mandates timely payments under the program and establishes a remedy in the event the department determines that an error or omission has occurred. I have no doubt that this statute, by directing and restraining the scope of administrative action in connection with payment for child care services, establishes a property interest in payment for the services that triggers due process protections.

An argument could be made, perhaps, that the accompanying regulations eviscerate any statutory property interest by providing for recoupment of funds paid for services provided during the pendency of an administrative appeal. As demonstrated by the district court ruling, the DHS rules themselves are very hard to decipher and cannot be harmonized.

But more importantly, in light of the statutory language in Iowa Code section 237A.13(4), I conclude that any rule that authorized recoupment as advocated by DHS would be *ultra vires.* To begin with, where the legislature has established remedies, I am not inclined to pencil into the statute additional remedies. That was the central teaching of

*Brakke v. Iowa Department of Natural Resources*, 897 N.W.2d 522, 530, 533–34, 540–41 (Iowa 2017). In *Brakke,* we refused to expand remedies in a statute regulating sick deer even though the agency believed expanded remedies would be administratively convenient or make the statute more effective. *Id.* at 540–42.

Further, I note that the legislature knows how to enact recoupment provisions. Iowa Code section 96.3(7) provides for recoupment of unemployment benefits. Iowa Code section 96.3(11) provides for recoupment of food stamps. As the district court observed, "The possession of authority by one administrative body and the absence of a grant of such authority in the statute relating to another administrative body significantly shows that the latter body possesses no such authority." *Branderhorst v. Iowa State Highway Comm'n*, 202 N.W.2d 38, 40 (Iowa 1972). And, it makes sense for the legislature to expressly provide for recoupment of benefits but not recoupment of earned payments for services rendered.

2. *Procedural due process: notice.* Endress received notice from DHS that "[a]ny benefits you get while your appeal is being decided may have to be paid back if the Department's action is correct." This notice does not provide fair warning that the clawback by the department of payments made will exceed those that the department has shown were improperly paid and would include payments fully earned by a provider.

First, the notice refers to "benefits". The payments to providers, however, are not benefits. Benefits are provided to families to utilize the services. The CCAP agreement makes no reference at all to benefits. Thus, a provider might well believe the notice did not apply to them but was boilerplate in DHS documents.

There is no question that the notice states that "any" benefits paid "may" have to be paid back. But may is not must. The term "may" ordinarily implies the use of some kind of discretion. *See, e.g.,* *Kingdomware Techs., Inc. v. United States*, 579 U.S. ___, ___, 136 S. Ct. 1969, 1977 (2016); *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 346, 125 S. Ct. 694, 703 (2005); *John Deere Waterloo Tractor Works of Deere & Co. v. Derifield*, 252 Iowa 1389, 1392, 110 N.W.2d 560, 562 (1961). In other words, DHS "may" in its discretion clawback paid benefits. We must, however, recognize and give effect to the choice of the word "may" and not "must" or "shall" in the notice. *Fairfield Sci. Corp. v. United States*, 611 F.2d 854, 862 (Ct. Cl. 1979) (noting default clause in government contract does not say "shall" or "must" but says "may," demonstrating the existence of discretion).

Such discretion vested in an agency has been held to give rise to an implied condition of reasonableness in many settings. *See, e.g., Darwin Constr. Co. v. United States*, 811 F.2d 593, 596 (Fed. Cir. 1987); *Schlesinger v. United States*, 390 F.2d 702, 709 (Ct. Cl. 1968); *Williamson v. N.Y. State Liquor Auth.*, 200 N.E.2d 565, 567 (N.Y. 1964). Thus, by analogy to the well-established principle that discretion must be reasonably exercised, to the extent "benefits" paid are unearned, or should not have been paid, the department may claw them back.

Assuming a provider would understand that he or she is receiving "benefits," even though the provider is, in fact, getting paid for services rendered under the CCAP agreement, a reasonable provider reading the notice would assume that DHS would act rationally and not impose a disproportionate penalty for thousands of dollars for an accounting error of much lower proportion. The language in the notice does not remotely

suggest, however, that the department may engage in grossly disproportionate, irrational clawback.

The notice does not say, for instance, "If you are found to have erroneously billed DHS by any amount, including 1 cent, we will claw back the entire amount of payments made during the pendency of your appeal as a forfeiture." In the alternative, the notice does not say, "You will have to pay back all payments earned for services rendered during the appeal if DHS prevails on the smallest billing issue as a forfeiture for using the administrative process." The notice does not tell you that if you lose even the smallest aspect of your appeal, you will suffer a forfeiture or penalty.

If the state wanted to assert such an extraordinary unqualified power of forfeiture, it could have done so in simple, clear language. DHS's position does not describe a reasonable discretionary clawback. It describes an unstoppable state-sanctioned steamroller that effectively and efficiently flattens license holders on the blacktop of an administrative appeal for the smallest of errors.

The majority finds that the bland language gives fair notice of the existence of the unstoppable state-sanctioned forfeiture steamroller. I don't see it. For sure, the notice gives fair warning that in the event you lose the appeal, the state will come after you and may even deduct from payments owed the amount of payments improperly billed. But the notice would not advise the average Jill or Joe that the state will clobber you if you get payments during the pendency of the appeal and you do not clean the state's clock completely and thoroughly on each and every issue raised in the administrative appeal.

If the notice were a statute, we would not construe it as does the majority. We may harken back to our law school days, where we learned that statutes should be construed to avoid forfeitures. *United States v.*

*One 1936 Model Ford V–8 Delux Coach, Motor No. 18-3306511*, 307 U.S. 219, 226, 59 S. Ct. 861, 865 (1939). While we are not faced with a question of statutory interpretation, it seems to me that we should require that notice of a forfeiture or penalty such as that advocated by DHS should be in very clear, maybe even in bold type. *Cf. Bell v Yale Dev. Co.*, 429 N.E.2d 894, 897 (Ill. Ct. App. 1981); *Sclafani v. Eastman Kodak Co.*, 727 N.Y.S.2d 277, 279–81 (Sup. Ct. 2001).

The above problem is compounded by the phrase "if the Department's action" is correct. What does that mean? What exactly is the department's action? What about where the department's position on incorrect billing is mostly wrong?

For the above reasons, I conclude that the notices received by Endress were constitutionally deficient under the due process clauses of the Iowa and United States Constitutions.

**B. Unjust Enrichment.** The plurality concludes that Endress is entitled to pursue an unjust enrichment claim in the district court. The plurality sees the same equities as I do in this case but puts it in a different legal package. In the alternative, however, since the due process argument as outlined in division II.A of my opinion has not prevailed, I too would remand to the district court for consideration of the unjust enrichment claim.

**C. Attorney Fees Under Iowa Code Chapter 625.29.** The key question under this fee-shifting statute is whether DHS's action was "primarily adjudicative." DHS's position throughout, however, has been that the only issue in the administrative adjudication was the amount of overpayment as defined by DHS. The other powerful issues, including the validity of the rules and constitutional issues of due process, could not be decided in the administrative process.

Endress and DHS do not have a dispute about the amount of money received by Endress for earned services during the pendency of the original administrative appeal. No one disputes that it amounts to be about $16,000. Thus, the only issue that DHS believed could be considered in the administrative process was uncontested and does not have any bearing in this appeal.

In denying Endress's claim for attorney fees, the district court stated that "the primary action in this case was to adjudicate the value of the overpayment." I do not agree. Instead, the key issues in this case related to the statutory authority of DHS to promulgate rules and the application of due process to the agency's action seeking to disgorge earned payments from Endress. These issues were not considered as they were outside the scope of the administrative process. As noted in *Branstad v. State ex rel. Natural Resources Commission*, the term adjudication in the statute means "to settle finally (the rights and duties of the parties to a court case) *on the merits of the issues raised.*" 871 N.W.2d 291, 297 (emphasis added) (quoting *Webster's Third New International Dictionary* 27 (unabr. ed. 2002)).

The fighting issues in this case, then, at least as they relate to due process, did not arise from an adjudication by DHS but instead arose from unreviewed administrative action of the department.[4] Under these circumstances, I would find Iowa Code section 625.29 fully applicable.

### III. Conclusion.

For the above reasons, I would affirm the decision of the district court on the due process issue. In the alternative, I would remand the case to the district court for consideration of the unjust enrichment claim.

---

[4]The ALJ did, however, decide the unjust enrichment claim on the merits. Under our caselaw, if DHS is acting primarily in an adjudicative capacity, no attorney fees are available.

I would reverse the decision of the district court on the question of availability of attorney fees under Iowa Code section 625.29.

#18–1329, *Endress v. Iowa Dep't of Human Servs.*

**McDONALD, Justice (concurring in part, dissenting in part).**

I concur in part and dissent in part. I concur in the plurality opinion's resolution of the due process issue. The plurality does not address the district court's ruling or Endress's argument that the Iowa Department of Human Services (DHS) exceeded its statutory authority in promulgating the recoupment rule. Nor does the plurality address the district court's ruling or Endress's argument that the recoupment rule is unconstitutionally vague. I assume the plurality concludes both that DHS had the authority to promulgate the recoupment rule and that the rule passes constitutional muster because the plurality remands the matter for reconsideration of Endress's unjust enrichment claim asserted in response to enforcement of the rule. If the plurality so concludes, I concur that DHS had the authority to enact the rule and that the rule is not unconstitutionally vague. However, I disagree Endress can assert a defense of unjust enrichment in response to DHS's effort to enforce a valid law, and I dissent on this issue. I thus join divisions III.A and III.C of Chief Justice Christensen's opinion, while dissenting as to division III.B.

I.

The plurality dislikes the recoupment rule and the application of the recoupment rule because it works a hardship on Endress. Fair enough. I agree. However, "[o]ur job as judges is not to write a decision to avoid an unfair result." *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 126 (Iowa 2011). Our job is to apply the law to the case at hand. At this job, the plurality falls short. The plurality relies on facts not supported by the record, uses these facts to construct a non sequitur, ignores controlling law, and then ignores the relevant portions of the persuasive authority upon which it relies that are directly contrary to the plurality opinion and

that demand the opposite result. The end result is an opinion that is irreconcilable with itself and "an example of the aphorism that bad facts can make bad law." *Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 705 (Iowa 2013) (Waterman, J., dissenting).

## A.

As an initial matter, this case does not appear to be a case, or at least a quintessential case, of unjust enrichment. The plurality states Endress provided a benefit to the state, but it is not clear she did. Endress provided child-care services to one or more persons while her appeal was pending. The beneficiaries of her services were the persons receiving the child-care services. *See, e.g.*, *Krieger v. Iowa Dep't of Human Servs.*, 439 N.W.2d 200, 203 (Iowa 1989) ("The DHS was not 'enriched' by the services rendered for the [beneficiary]. Krieger worked for the [beneficiary], not for the DHS, and the DHS received no benefits from his services."). DHS was merely the third-party payor for the services provided. Endress's claim of unjust enrichment more appropriately lies against the persons to whom she provided child-care services and not DHS. The plurality cites no case or authority allowing for a claim of unjust enrichment against a third-party payor under the circumstances presented.

Finding no authority allowing for an unjust enrichment claim against a third-party payor, the plurality finds DHS was a direct beneficiary of Endress's services. The plurality's finding is based on the following facts and rationale: in some circumstances, certain day-care providers provide services for children with protective needs; this, according to the plurality, implicates the state's duty as *parens patriae*; and, according to the plurality, when DHS acts as *parens patriae* it is the beneficiary of any services provided to the families.

The doctrine of *parens patriae* is simply inapplicable here. There is nothing in the record to show Endress was providing protective services during the relevant time period. There is also nothing in the record to show the state was acting as *parens patriae* in this case. The fact that some other child-care providers might provide protective services for some other children under some other program not at issue in the case does not change the fact DHS was merely a third-party payor for the services Endress provided to someone else.

Even if the doctrine were applicable here, the doctrine does not actually support Endress's claim of unjust enrichment. The "doctrine is derived from the English common law and is inextricably linked to a superiority of the state in its relations with its subjects." *B.A.A. v. Chief Med. Officer, Univ. of Iowa Hosps.*, 421 N.W.2d 118, 121 (Iowa 1988) (quoting *Contemporary Studies Project: Facts and Fallacies About Iowa Civil Commitment*, 55 Iowa L. Rev. 895, 958–59 (1970)). It merely explains the state's duty and authority to act to protect others. The plurality fails to cite any authority that would support a claim that an unauthorized service provider can demand money from the government or refuse to repay money lawfully owed the government merely because the government was acting in its capacity *parens patriae*. The invocation of the doctrine is a non sequitur.

### B.

Even if one were to assume Endress's provision of child-care services constituted a benefit to DHS, the principles underlying the doctrine of unjust enrichment do not support her claim. The doctrine of unjust enrichment is not an open-ended doctrine that allows a court to "sit like a kadi under a tree dispensing justice according to considerations of individual expediency." *Terminiello v. City of Chicago*, 337 U.S. 1, 11, 69

S. Ct. 894, 899 (1949) (Frankfurter, J., dissenting). " '[U]njust enrichment' is a term of art." Restatement (Third) of Restitution & Unjust Enrichment § 1 cmt. *b*, at 4 (Am. Law Inst. 2011) [hereinafter Restatement (Third)]. The concept of unjust enrichment is not a judicial remedy to correct perceived injustices, unfairness, or inequities in a broad sense. Rather, the doctrine involves a "narrower set of circumstances giving rise to what might more appropriately be called *unjustified enrichment*." *See id.* at 5. In the technical sense, "[u]njustified enrichment is enrichment that lacks an adequate legal basis." *Id.*

To the extent DHS was enriched by Endress's service, there is an adequate legal basis to justify the enrichment: Endress was given notice that any payments made to her under the child-care assistance program during the pendency of her appeal would have to be repaid in the event she lost her appeal. Specifically, the notice of decision told Endress she could "continue to receive child-care assistance funding pending the outcome of [her] appeal." It continued, stating "any benefits [she receives] while [her] appeal is being decided may have to be paid back if the Department's action is correct." The notice then directed Endress to the administrative rule requiring recoupment. The plurality agrees DHS provided Endress notice that any compensation paid to her while her appeal was pending was subject to recoupment.

DHS's notice of recoupment to Endress precludes her defense of unjust enrichment against DHS. *See* Restatement (Third) § 16 cmt. *a*, at 214 (explaining that a legal entity, such as government agency, would have a claim to recover benefits conferred under a contract where a statute limited the entity's authority to contract); *id.* § 33 cmt. *f*, at 538 (explaining a party has no claim for unjust enrichment where the party acts despite having notice of a limitation on the government's authority to contract

"because the restitution claim may not be intentionally employed as a means either to circumvent procedural requirements or to expand the scope of [government] authority"). While the plurality relies on the Restatement (Third) to support its conclusion, it ignores these sections of the Restatement (Third) that directly address the question presented in this case and that expressly reject the plurality's conclusion that unjust enrichment is available against the government where the party asserting the claim had notice.

More problematic for the plurality is the Restatement (Third)'s rule is in accord with Iowa law. "The theory of unjust enrichment 'is premised on the idea that it is unfair to allow a person to benefit from another's services when the other expected compensation.' " *Waldner v. Carr*, 618 F.3d 838, 848 (8th Cir. 2010) (quoting *State Pub. Def. v. Iowa Dist. Ct. for Woodbury Cty.*, 731 N.W.2d 680, 684 (Iowa 2007)). When Endress pursued her administrative appeal, DHS provided her with notice she would have to repay the funds if her appeal was unsuccessful. The plurality opinion agrees DHS provided Endress with notice. Upon receiving notice, Endress had no expectation she would be able to retain the funds under the circumstances presented. In the absence of an expectation that she would be entitled to retain the funds, Endress has no claim for unjust enrichment.

There is an additional adequate legal basis to justify DHS's recoupment rule: the government's general duty and authority to protect the fisc. *See, e.g., Brock v. Pierce County*, 476 U.S. 253, 262, 106 S. Ct. 1834, 1840 (1986) (stating "the protection of the public fisc is a matter that is of interest to every citizen"). Part of the government's general duty and authority to protect the fisc is the promulgation of statutes, rules, and regulations establishing the purposes, terms, and conditions for the

expenditure of public funds. *See Godfrey v. State*, 847 N.W.2d 578, 588–89 (Iowa 2014) (Waterman, J., dissenting) (explaining the legislature established a statutory certification procedure to determine when public funds should be available to defend a lawsuit and the statutory procedure should not be overridden by the court at the urging of a party's attorney). An additional part of the government's general duty and authority to protect the fisc is the recoupment of funds paid from the fisc where the payment violated the statutes, rules, and regulations authorizing the purpose, terms, and conditions for the expenditure of public funds. *See Fernandez v. Iowa Dep't of Human Servs.*, 375 N.W.2d 701, 709 (Iowa 1985) ("More importantly, as a department of the state government it had a duty and implied authority to recoup from the provider payments incorrectly made when the payments were made because of rule violations by the provider."); *see also In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 5 (1st Cir. 2004) ("Both by statute and by contract, the [government agency] has the unqualified right to recoup these overpayments in full, and to return the funds to the public fisc, where they can be used to fund other facilities providing care to . . . beneficiaries." (Emphasis omitted.)).

The government's general duty and authority to protect the fisc is so fundamental to the sound operation of government that certain claims and defenses cannot be asserted against the government to create liability or deny liability in contravention of statute. For example, "[l]aches . . . does not apply against the government." *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 33 (Iowa 2013). "[I]n Iowa, it is well recognized that a statute of limitations does not run against the state unless specifically provided by statute." *Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163, 169 (Iowa 2006). By way of another example, "no right of prescription may be acquired against the government." *State v. Hutchison,* 721 N.W.2d 776,

782 (Iowa 2006).  Also, as a general rule, "equitable estoppel will not lie against a government agency."  *ABC Disposal Sys., Inc. v. Dep't of Nat. Res.*, 681 N.W.2d 596, 607 (Iowa 2004).

One of the claims that cannot be asserted against the government to create liability or, as here, as a defense to liability are claims of quantum meruit and unjust enrichment.  *See United States v. $30,006.25 in U.S. Currency*, 236 F.3d 610, 614 (10th Cir. 2000) ("[W]e [are not] aware[] of any general waiver of sovereign immunity for unjust enrichment claims.  Moreover, fairness or policy reasons cannot by themselves waive sovereign immunity."); *see also United States v. Craig*, 694 F.3d 509, 513 (3d Cir. 2012)).  The appellate courts of this state have explicitly rejected the contention that a party can demand payment from the government under a theory of quantum meruit or unjust enrichment where the payment would be in contravention of statute.

In *Iowa District Court for Woodbury County*, an attorney was appointed to serve as a guardian ad litem.  731 N.W.2d at 682.  She failed to comply with the statutory requirements in submitting her application to exceed the statutory fee limitation.  *Id.*  The attorney sought fees for services she actually performed.  731 N.W.2d at 683.  We disallowed the attorney's demand for payment under a theory of quantum meruit on the ground that "[a]llowing a theory of *quantum meruit* to supersede clear statutory requirements would serve to undermine the legislature's purpose in enacting section 815.10A(2)."  *Id.*  Similarly, in *State Public Defender v. Iowa District Court for Clarke County*, we concluded the district court erred in approving an attorney's fee claim "based on the [district] court's 'plenary powers to exercise justice among the parties' " where the fee claim was contrary to statute.  745 N.W.2d 738, 739, 740 (Iowa 2008).  Finally, in *Madrid Lumber Co. v. Boone County*, we held a contractor was not entitled

to payment when it provided services to a county but the contract for the services was not approved in accord with statute. 255 Iowa 380, 386, 121 N.W.2d 523, 527 (1963).

The court of appeals has relied on our precedents in this area. The court of appeals has interpreted *Iowa District Court for Woodbury County* for the proposition that a claim for quantum meruit "could not be used to supersede the affirmative requirements of the statute." *In re G.P.*, No. 09–0156, 2009 WL 3337641, at *1 n.1 (Iowa Ct. App. Oct. 7, 2009). In *Jacobsma v. Iowa District Court*, No. 06–1877, 2007 WL 4553636, at *3 (Iowa Ct. App. Dec. 28, 2007), the court of appeals rejected an attorney's claim for compensation under theories of unjust enrichment and quantum meruit. The court explained it was for the legislature to address any inequity caused by the statutory requirements:

> While we sympathize with Jacobsma and understand his frustration with the public defender's denial of his fee claim, it is up to the legislature and not this court to determine whether changes should be made in the fee approval/denial process it has established for court-appointed attorneys.

*Id.* The court of appeals' rationale in *Jacobsma* is applicable here. While the plurality opinion may think the recoupment provision is unfair, this court does not have the authority to countermand a statute and administrative rule that six justices hold is valid and enforceable.

Pursuant to this controlling authority, this court has explicitly rejected claims of unjust enrichment asserted against DHS and other government agencies. In *Ahrendsen ex rel. Ahrendsen v. Iowa Department of Human Services*, this court held a party's claim of unjust enrichment would not lie where the department administered a program consistent with the relevant statutes and regulations. 613 N.W.2d 674, 679 (Iowa 2000). In *Marshall v. State*, this court explained the department was

required and entitled to recoupment of welfare benefits despite it being a "harsh result." 559 N.W.2d 612, 613, 615 (Iowa 1997). The court further explained it lacked the authority to modify the statutory regime to achieve an "equitable result." *Id.* at 615. Similarly, in *Krieger,* this court rejected the claimant's contention the department would be unjustly enriched by recoupment of benefits paid. 439 N.W.2d at 203. This court explained there was strong public policy supporting the enforcement of the recoupment statute and "denying recoupment would frustrate that policy." *Id.* Our cases are consistent with the Restatement (Third)'s legal standard of unjust enrichment as opposed to the plurality's moral standard of unjust enrichment.

The government's duty and authority to recoup funds hold even when the recipient of said funds was not at fault and the recoupment of said funds might be inequitable, in the colloquial sense, under the circumstances presented. *See State ex rel. Mack v. Mack,* 479 N.W.2d 327, 329 (Iowa 1992) ("However sympathetic Michele's plight may be, her legal defenses to the State's reimbursement effort lack merit."); *Fernandez,* 375 N.W.2d at 709 ("We conclude that the hearing officer's interpretation that the administrative rules gave the department authority to recover from the appellant any incorrectly paid assistance by suspending or withholding [M]edicaid payments is neither plainly erroneous nor inconsistent with chapter 249A."); *Powell v. Emp't Appeal Bd.,* 861 N.W.2d 279, 281 (Iowa Ct. App. 2014) (holding state was entitled to recoupment of unemployment compensation benefits notwithstanding the recipient's "lack of fault in incurring the overpayment"); *see also Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.,* 467 U.S. 51, 62, 104 S. Ct. 2218, 2225 (1984) ("There is no doubt that respondent will be adversely affected by the Government's recoupment of the funds that it has already spent. It will surely have to

curtail its operations and may even be forced to seek relief from its debts through bankruptcy. . . . [B]ut questions concerning the Government's method of enforcing collection are not before us.").

There is a related but additional reason Endress's claim of unjust enrichment fails here: DHS's general interest in protecting the fisc is bolstered in this case by federal command. The federal government provides funding to the states for child-care programs and services pursuant to the Child Care and Development Block Grant. *See* 42 U.S.C. §§ 618, 9858 (2018). Funds from the block grant program are placed with matching dollars from the state into the Child Care Development Fund. *See id.* §§ 618(a)(2), 9858. Pursuant to federal law, DHS is required to administer the Child Care Development Fund "responsibly to ensure that statutory requirements are met." 45 C.F.R. § 98.1(b)(6)(2019). DHS also has the "overall responsibility for the administration of the program." *Id.* § 98.11(b);*see also* 42 U.S.C. § 9858b (requiring a lead agency and outlining its duties). This includes the duty to promulgate rules and regulations for the program and the duty to oversee the funds. *See* 45 C.F.R. § 98.11(b)(1)–(8); *see also* 42 U.S.C. § 9858c (outlining administration and enforcement guidelines). This also includes the duty to regulate who can receive payment as an eligible child-care provider. *See* 45 C.F.R. § 98.2 (defining eligible child-care provider); *id.* § 98.40–.41 (discussing eligibility criteria).

In seeking recoupment, the state, generally, and DHS, specifically, are discharging their obligation to administer the Child Care Development Fund in a lawful manner. The Iowa General Assembly instructed DHS to implement rules for the "administration" of the program. *See* Iowa Code § 237A.12(1)(g) (2017). This included rules to govern the disbursement and recoupment of funds for the child-care assistance program at issue in

this case. DHS's rules provide "excess assistance paid pending a final decision shall be recovered to the date of the decision." Iowa Admin. Code r. 441—7.9(7) (2017). DHS's rules provide DHS shall recoup all "benefits or payments issued pending an appeal decision." *Id.* r. 441—170.9(2). The plurality agrees DHS had the authority to promulgate and enforce the rules. The recoupment proceeding here is thus merely the lawful enforcement of valid rules.

No claim of unjust enrichment lies under the circumstances presented in this case. The law of restitution is not concerned "with unjust enrichment in any such broad sense . . . because the justification in question is not moral but legal." Restatement (Third) § 1 cmt. *b*, at 5. Properly understood, unjust enrichment is not applicable where there is a legal justification for the enrichment. *See id.* There are numerous legal justifications why Endress cannot assert a defense of unjust enrichment against DHS. The plurality simply ignores the black letter law and the controlling precedents requiring that conclusion. The plurality's failure to follow the relevant principles and precedents renders the plurality opinion irreconcilable with itself. The plurality holds DHS's recoupment statute and rule are valid and enforceable except when DHS seeks to enforce the statute and rule. The plurality's fallacious expansion of the doctrine of unjust enrichment is bad law. "[U]njust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).

C.

Not only is the plurality opinion bad law, it is bad policy. The plurality ignores the adverse impact its decision will have on the administration of the child-care assistance program. Child-care assistance providers now have additional incentive to appeal contract

termination decisions and drag out the administrative appeal process for as long as possible. The plurality rule removes all risk to the child-care assistance providers from pursuing an appeal of DHS's decision to terminate a provider agreement given that DHS is now powerless to recoup funds paid during the appeal period. The plurality rule is bad policy and forces DHS into de facto noncompliance with its federal and state mandates.

## II.

Unfortunately for the legislative and the executive branches, there is no way to fix the problem the plurality opinion creates. The plurality concludes the legislature passed a law allowing recoupment of payments made to unlicensed providers. The plurality concludes DHS passed a rule allowing recoupment of payments made to unlicensed providers. The plurality concludes these laws are valid, pass constitutional muster, and are enforceable except when DHS seeks to enforce them. Under the plurality's interpretation, the legislative and executive branches are not entitled to set the terms and conditions upon which funds can be disbursed from the public fisc if the court does not think it fair. That is a shocking conclusion. Literally unprecedented. The plurality opinion does not cite a single case in which a payee was able to successfully assert a claim for unjust enrichment against the government where, pursuant to a valid statute and administrative rule, the government put the payee on notice the government would seek recoupment of payments because the payee was not eligible to receive the payments. The legislative and executive branches have no recourse. What can they do? Reenact the same law the plurality concludes is valid except this time with the proviso, "This time, we really, really mean it." I dissent.

Oxley and McDermott, JJ., join this concurrence in part and dissent in part.